LOUIS P. ERNST et al., Appellants, v. THE CITY OF SPRINGFIELD et al., Respondents.

Springfield Court of Appeals, June 6, 1910.

1. TAXBILLS: Improper Allowance to Contractor. In a suit by property-owners for the cancellation of certain taxbills issued for the payment of construction of sewers in a city of the third class, the evidence showed that the measurements of the rock excavation which were used in estimating the amount to be allowed the contractor for the excavation were made by an "inspector," who had been employed by the city engineer; that the inspector was inexperienced and the measurements or estimates were not made according to the contract and the city ordinance covering this class of work, of all of which the contractor had knowledge; that the allowance for the work was greatly in excess of what should have been allowed. *Held*, that under the evidence the burden was upon the contractor to

show the amount properly allowable for this work, and where the sewers had been completed and it is impracticable to make an accurate estimate of the actual amount of rock excavated, and therefore became impossible to separate the legal from the illegal charges; that the whole amount included in the taxbills for this particular work should be declared illegal and deducted from the bills.

2. ———: Duty of Engineer: Inspection and Estimate of Work by Other Person. In a suit for the cancellation of taxbills issued in payment for the construction of a sewer it appeared that the measurements and estimates of certain flint rock excavations had been made by an "inspector" employed by the city engineer. *Held*, that neither the statutes, city ordinances, nor the contract sanctioned the substitution of the inspector for the engineer, nor did they authorize the inspector to perform the duties enjoined upon the engineer personally. *Held*, further, that the official estimate by the engineer of the amount of flint rock excavated in the sewer under the facts in this case was a prerequisite to the validity of the taxbills.

3. ———: ———: ———. Where under the contract and ordinances it is provided that an estimate of the flint rock excavation made in the construction of a city sewer, shall be made by the city engineer, the engineer is not required to perform the mere manual or clerical labor necessary to the actual measurements, but he is required to apply his professional skill and judgment in securing a proper measurement of the rock and to give the matter his personal supervision, and he cannot delegate the performance of this duty to a so called "inspector."

4. OFFICERS: Delegation of Duties to Others. A public officer cannot delegate to others the performance of the duties of his office.

Appeal from Greene Circuit Court.—*Hon. James T. Neville*, Judge.

REVERSED AND REMANDED (*with directions*).

*Henry C. Young* for appellants.

(1) The false statements contained in the city engineer's report to the council, by which excessive charges for flint ledge, lime rock and earth excavation were sought to be created against the property of appellants, and so made by the engineer with full knowl-

edge on the part of the defendant, Huff, of their material falsity, constitute such fraud as to render the taxbills void. Derby v. Donahue, 208 Mo. 684; Mill Co. v. Sugg, 206 Mo. 148; White v. Reitz, 129 Mo. App. 307; Baird v. Grannis, 208 Mo. 426; Brokerage Co. v. Gates, 190 Mo. 391; Hamlin v. Abell, 120 Mo. 203; Bishop v. Seal, 87 Mo. App. 261; Lovelace v. Suter, 93 Mo. App. 429; Chism v. Schipper, 2 L. R. A. 544; Edwards v. Hartshorn, 1 L. R. A. (N. S.) 1050; State ex rel. v. Cartwright, 122 Mo. App. 267; Serrano v. Commission Co., 177 Mo. App. 199. (2) Since it is impossible to separate with even approximate accuracy the illegal overcharges from the taxbills, the whole assessment is necessarily illegal and void. Hoag v. Ward, 186 Mo. 325; Hallett v. Bond Co., 90 Pac. 683. (3) The inspector, Mr. Eddy, was not properly appointed by the council, was not sworn in as an inspector and was not a city officer. Weisner v. Bank, 106 Mo. App. 668; Nevada v. Eddy, 123 Mo. 540; Heman v. Farrish, 97 Mo. App. 377; Akers v. Kolkmeyer, 97 Mo. App. 520; State ex rel. v. Washburn, 167 Mo. 680; Trenton v. Collier, 68 Mo. App. 492; Wheeler v. Poplar Bluff, 149 Mo. 36.

*W. D. Tatlow, Barbour & McDavid* for respondents.

(1) The superficial and crude investigation by some members of the council long after the sewer 'had been completed and filled up was unauthorized and void. Rogers v. Rehard, 122 Mo. App. 44; Board of Education v. Surety Co., 183 Mo. 182; McGregor v. Construction Co., 188 Mo. 622; McCormick v. St. Louis, 166 Mo. 326; Williams v. Railway Co., 112 Mo. 487; Whitworth v. Webb City, 204 Mo. 599; Reilley v. Albany, 112 N. Y. 32; Joplin ex rel. v. Freeman, 125 Mo. App. 722. (2) In this case the evidence conclusively shows that all the proceedings were regular and

that the work was done in substantial compliance with those proceedings, and the court has so found in its judgment rendered in the case. State ex rel. v. Flad, 26 Mo. App. 503; Dickhaus v. Olderheide, 22 Mo. App. 79; Johnson v. Duer, 115 Mo. 382; Porter v. Paving Co., 214 Mo. 22; Treat v. Chicago, 130 Fed. 444. (3) The trial court deducted the excessive flint allowance, offset it against the accrued interest on the correct amount due on the taxbills and rendered judgment in favor of the defendant contractor for the face of the respective taxbills. In an action at law this finding of facts is conclusive. Platte City v. Paxton, 124 S. W. 531; Fruin v. Meredith, 122 S. W. 1113. (4) The inspector was appointed in the regular way. Nothing to the contrary is shown. He is in no sense a city officer. He does not draw an annual salary, nor is he appointed for a definite term. Akers v. Kolkmeyer, 97 Mo. App. 528; Hilgert v. Paving Co., 107 Mo. App. 385; Jones v. Plummer, 137 Mo. App. 337. (5) When the court reduces the amount of taxbills because found to have been issued for too large an amount, the interest or penalty provided in the taxbills must be allowed on the balance of the taxbills after making the proper reductions. Neill v. Ridge, 220 Mo. 256; Neeman v. Smith, 60 Mo. 295; Perkinson v. Schnaake, 108 Mo. App. 261.

NIXON, P. J.—This is an action in equity seeking relief against the enforcement of certain taxbills issued for the construction of a sewer in the city of Springfield, Missouri, and asking that said taxbills be canceled and set aside as being a cloud on the title of the property of appellants. The grounds of relief are for fraudulent practices set forth in the petition.

The sewer in question is in sewer district No. 5 of said city, which is a city of the third class. It is claimed that the advertisements for bids were irregular and void; that no estimate was made of the cost of construction of the sewer prior to the making of the con-

tract; that no plans or specifications were prepared and submitted to the council as required by the ordinances of the city; that the taxbills were for the cost of flint rock which was never excavated by the contractor and that said taxbills are gross over-charges for the work actually performed; that the appellants are the owners in severalty of one or more lots and tracts of land situated within the sewer district and against whom the taxbills were issued for the construction of the sewer. The defendants are the city clerk and John Huff, the contractor.

The bid of John Huff for the construction of the sewer was made on November 17, 1906, and the contract was entered into between him and the city for the construction of the sewer on the 19th day of November, 1906.

Section 98 of the charter of Springfield is as follows: "As soon as any district shall have been completed, the city engineer or other officer having charge of the work shall compute the whole cost thereof and shall apportion the same against the lots or pieces of ground exclusive of the improvements in proportion to the area of the whole district, exclusive of public high ways, and such officer shall report the same to the council by bill or otherwise and the council shall thereupon levy and assess a special tax by ordinance against each lot or piece of ground within the district in the name of the owner thereof."

On the 16th of January, 1907, the city engineer, C. E. Phillips, presented to the city council a statement in which he reported that the sewer had been completed and that the total cost amounted to $4063.33, and that the same had been computed by him and apportioned according to law. In this report he included a charge for 16,357 feet of flint rock, charged at 12½ cents a foot, making a total of $2044.62.

Section 585 of the ordinances of the city of Springfield relating to public improvements is in part as fol-

lows: "All work done under contract entered into under the provisions of this chapter shall be done and carried on under the supervision and direction of the city engineer and street committee, who shall personally inspect the work as it progresses and see that the same is done in accordance with the plans, specifications, contract and ordinances governing the same. Each part thereof must be, by them, approved before that portion of the work next to follow is commenced."

Sections 648 and 649 of the ordinances are as follows:

"Sec. 648. All work done under the provisions of this article shall be carried on under the direction of the engineer and sewer committee, and shall be done in accordance with the plans, specifications, rules and regulations on file in the office of the engineer, and in accordance with the contract and ordinances governing the same.

"Sec. 649. The word 'engineer' as herein used shall mean the party designated as such by the city council who shall have charge of all work done under the provisions of this article to inspect and superintend the same, and, subject to the approval of the sewer committee and the city council, may appoint the necessary assistants to enable him to carry on the work he may have in hand."

The contract entered into for the construction of the sewer contained among others the following provision: "The word engineer as herein employed, shall be construed to mean such person as shall be designated by the city council, whose duty it shall be to superintend the work in all its details, pass upon, and reject such material as may not be in conformity with these specifications, designate when the work shall begin, and superintend construction, pass upon all questions as to the intent and meaning of these specifications. The engineer, subject to the approval of the sewer committee, may appoint, and place upon the work, such in-

spectors as he may see fit, fully authorized to act for him in his absence."

The contract also contained the following provisions as to rock excavation:

"Whenever rock is encountered in excavating the trenches, it shall be stripped of earth in sections of not less than fifty feet in length, and the engineer duly notified that he may measure or cross-section the same. All rock removed before such measurement is made, or rock more than six inches below the grade of the bottom of the trench, will not be allowed for and estimated.

"The rock shall be taken out a width one foot greater than the external diameter, and six inches below the grade of the outer curved bottom of the sewer. The trench shall then be filled up to the required grade and shape with proper material as the engineer may direct.

"Only such ledge rock, limestone, as requires blasting for removal shall be estimated as rock excavation, and will be paid for by the lineal foot, depth of earth excavation to cease where the rock excavation begins. Well defined ledges of flint will be paid for at one-half the price of rock excavation."

C. E. Phillips was the city engineer and R. S. Eddy was appointed as inspector. R. S. Eddy testified in part as follows: "I was appointed inspector by Mr. Phillips, the engineer. I had never been inspector on any other job; that was my first job and I have never had any other job of the kind since. As inspector, I was not sworn to perform any duty. I never had any commission of any kind or description; no commission was issued to me under the authority of the city. The reason Mr. Phillips employed me was because I asked him if he could give me an inspectorship. At the time I asked him for the job I was not doing anything, but lived in the east end of town and had known Mr. Phillips some fifteen or twenty years. I was paid for the work at two dollars

a day by Mr. Phillips; that is, Mr. Phillips gave me the money; I don't know where the money came from but presume it came from Mr. Huff. I couldn't tell you a thing about how often I was paid; if I wanted a little money, I went to Mr. Phillips and he gave it to me; I got no money directly from Mr. Huff; I had no stated days or periods when I got money; I don't remember how much money I got from Mr. Phillips; I can't give any idea; I am 72 years of age. I was never required to read the contract between the city and Mr. Huff. The only duties I had to perform besides measuring the rock was looking after the pipe. The work was laid out in sections of one hundred feet each. The first section of one hundred feet I did not have anything to do with. As to the character of the formation in the second one hundred feet, my impression now is that it was flint and a considerable portion of limestone; I mean by 'flint' hard material on which you have to use picks and bars, and powder to shoot out. Q. Was that a solid body of flint rock? A. I think you would think it was solid if you had to dig it out. Q. Was it a solid ledge of flint rock? A. It was a solid bar of flint rock; I can't tell what you mean by 'ledge.' Q. Now how much clay was there mixed through that rock? A. Oh, I couldn't tell you now. Q. Well, some approximate idea? A. That was a good many months ago. Q. There was some clay in that, wasn't there? A. I expect there was a little. Q. What proportion of it was clay? A. I couldn't tell you. Q. Was there ten per cent. of clay? A. I couldn't tell you a thing about it; you must remember that a man as old as I am doesn't remember like a young man. Q. Have you any memory at all about what was the condition of that ditch? A. No, sir; and I wouldn't know at all about it except from my records. Q. Have you any memory at all as to what was the precise material you measured up there as flint? A. I don't know a thing about it except what the records show."

He also testified as follows: "Q. You said a while ago in your opening testimony that in measuring this rock you waited until the excavation was made and measured from the surface of the ground down to grade line in order to ascertain the measurement of the rock. Is that correct? A. Yes, sir. Q. That applied to flint rock as well as to lime rock, didn't it? A. That is the flint rock; not the lime rock. Q. I will ask you when you encountered this flint rock in the course of the excavation you caused that flint rock to be stripped bare of earth and called in the engineer to measure it? A. No, sir. Q. I will ask you if as a matter of fact you didn't determine the amount of flint rock that had been excavated from these ditches by measuring the side holes of the ditch? A. Yes, sir. Q. That is the way you ascertained it? A. Yes, sir. Q. You would stand on the bank on the top and pass a tape down to the men in the ditch? A. Pass it down to the bottom of the ditch. Q. And have some one on there to hold it? A. Sometimes I did and sometimes I didn't. Q. How did you find whether it was on the bottom or not? Did you have it weighted? A. By letting the line touch. Q. Would you read that from the side of the ditch next to you or would you have some one read it down in the ditch? A. Sometimes I stood over on the opposite side and put it right down over there. Q. Now, could you reach across a two-foot ditch and hold that tape accurately enough to see the quantity of flint rock exhibited by the sides of that excavation? A. Yes. Q. And that is the way you measured up all of these flint rock formations you have reported here? A. Yes, sir. Q. What instructions, if any, did you receive from the city engineer in relation to the character of the material that you were required under your duties to measure up as flint formation? A. All of that hard material that would require pick and bar and powder to get out. Q. That was his instruction to you? A. Yes, sir. Q. He

didn't tell you to confine your measurements then just to well defined ledges of flint rock, did he? A. No, sir."

C. E. Phillips, the city engineer, testified in part as follows: "Q. How many times were you on that work during the whole time? A. Perhaps a dozen times; maybe less, and only a short time each time. Q. Did you make up your report from your personal investigation to the council? A. No, sir. Q. Did you keep tab on the inspector's report and check it up as the work progressed? A. No, sir. Q. Did you make any personal investigation to whether that report was correct or not? A. No, sir. Q. You don't know whether it was correct or not when you turned it in? A. I talked with the inspector along occasionally. Q. You didn't go and make any test or check up the work? A. I didn't go and measure and check over his work. Q. Now, there was 200 feet of lime rock charged for in section 2; you recollect that fact? A. Yes, sir. Q. And you recollect the fact also that you charged for an extra six inches of lime rock excavated beneath the grade line? A. Yes, sir. Q. And you made that allowance notwithstanding the fact that you didn't know personally that that face of lime rock extended the whole length of the section, didn't you? A. Yes, sir."

John Huff, the contractor, testified in part as follows: "Q. Now in reference to the time you were there, state how much of the time R. S. Eddy was there as inspector for the city. A. He was there all the time. I never missed him there any time. Q. Who did the measuring of the sewer trenches and lime rock and flint rock taken out? A. Mr. Eddy. Q. Just state when he made those measurements and how, in your own way? A. Well, if the ditch was being dug he generally always measured it after they got it down to grade. Generally, he would take his tape, and then I would see him figuring in his book. Q. State how he measured flint rock. A. Well, he would drop his tape down in the ditch and measure the side of the ditch and at the end

up next to the header, and along the side. Q. How was the lime rock measured? A. Well, the lime rock was measured on the grade pole. He would set the grade pole down on the rock and sight over the board and see how much it stuck up. Then he would put his tape at the northern station and pull his tape up and measure the length of it from the top of the ditch. Q. When was the lime rock measured; before it was taken out or afterwards? A. Before it was taken out; lime rock was always measured when it was shot. Q. State whether or not Mr. Eddy was along observing this excavation at the time the men were digging the ditch out? A. Yes. Q. I will ask you whether or not you took any of these measurements yourself of the lime rock and of the flint rock for the purpose of making any comparisons to see what amount there was there? A. Yes, sir. Q. Just state to the court what you did. A. I measured the flint to see what amount of flint there would be and there was no lime in the first section. That is, the first 100 feet from where we started on Nichols street. In the second section there was right smart of lime; considerable in there. I measured the lime in that, and I found out from Mr. Eddy what he had measured in there, so we compared to see how it run. That was my object in finding out from him what he had allowed. Q. Now just state to the court if you followed that same method all the way through? A. I followed that same method pretty well all the way through; that is, I took measurements now and then. I didn't measure every section. I only measured in about every other section after that."

He testified on cross-examination in part as follows: "Q. And he showed you the book in which allowances for rock measurements were credited to you? A. No, sir; he never showed me any book. Q. When did you first see his book? .A. I never saw his book at all. Q. You never asked him how much rock he was allowing

you? A. I asked him; I didn't see the book. Q. Although you knew that book would be the basis of his report? A. Yes. He gave me a statement on a piece of paper once of how much he was allowing. Q. When did he give you that statement on paper. Right after you finished the first section? A. I think we had got up to section 7. Q. Now all the rest back of that had been filled up before you got any statement from the inspector? A. Nothing only what he told me. Q. You received no written statement of any character, did you, and didn't make any inspection of his book? A. No, I never saw his book. Q. And you were thoroughly satisfied to be governed by what he had written down there for his report? A. Well, yes, sir; I thought Mr. Eddy was an honest man and wanted to do the right thing. Q. So you relied on Mr. Eddy giving you a rock measurement satisfactory to you? A. I thought he would do the right thing by everybody. Q. You were perfectly satisfied with what he might report? A. I was satisfied Mr. Eddy would do what was right. Q. You were satisfied with the report that you expected to be shown by that book of his? A. Yes, sir. Q. Didn't you know at the time this excavation was being made that he was allowing you for these large quantities of rock throughout the length of the sewer trench? A. I thought he was allowing me wherever the rock was. Q. Didn't you know he was allowing you for these large quantities of rock throughout the trench? A. Why, certainly. Q. So in section No. 1 you knew he was allowing you for about nine feet of flint rock? A. Yes, sir. Q. And in section No. 2 you knew he was allowing you for about eight and one-half feet of rock? A. Yes, sir. Q. And in section 3 you knew he was allowing you for about 8.30 feet of flint rock? A. I didn't know how much he was allowing me until after I got up to section 7. Q. Didn't you know that he had made these large allowances to you for rock before that time? A. I knew what he had allowed me on the first two sections. Q.

Didn't you know what he was allowing you on section 3? A. No, sir; I didn't know it until we got up to section 7. Q. Nor in section 4? A. I didn't know what he was allowing in section 4 until we got to section 7, and he gave me a statement of it. Q. You didn't know that until after all these trenches had been filled in, did you? A. No, sir. I saw what he allowed in these other two sections, and I had measured them and I knew he was about right in them, and I thought he was allowing what was right, and I got to section 7 and I asked him for a statement of it. I took the measurement of section 7 myself."

Samuel R. Fisher, the assistant city engineer, identified the inspector's book which purports to contain a statement of the respective quantities of limestone and flint rock excavated from the various divisions or sections of the sewer trench. The respective amounts of each of these, as shown by said book are set forth in the following tabulation. The divisions or sections are shown in consecutive order in the first column, and the average depth in feet of limestone and flint rock contents are shown in corresponding lines in the second and third columns. The figures given show the averages distributed over the entire 100 feet of each division as indicated by said book

Ernst v. Springfield.

| Division. | Average Feet Flint Rock. | Average Feet Limestone. |
|---|---|---|
| 0 to 1 | 9. | |
| 1 to 2 | 8.5 | 2. |
| 2 to 3 | 8.3 | 1.03 |
| 3 to 4 | 6.02 | |
| 4 to 5 | 5.44 | .55 |
| 5 to 6 | 5.25 | .57 |
| 6 to 7 | 7.8 | .53 |
| 7 to 8 | 8.07 | .01 |
| 8 to 9 | 9.5 | |
| 9 to 10 | 9.8 | |
| 10 to 11 | 8.43 | |
| 11 to 12 | 10.04 | .06 |
| 12 to 13 | 10.25 | .3 |
| 13 to 14 | 10.1 | .05 |
| 14 to 15 | 10.3 | .92 |
| 15 to 16 | 5.53 | |
| 16 to 17 | 2.97 | |
| 17 to 18 | 6.88 | |
| 18 to 19 | 8.3 | |
| 19 to 20 | 6.75 | |
| 20 to 21 | 5.23 | |
| 21 to 22 | 1.26 | |
| 22 — | 3.00 | |

There was a mass of evidence offered by the respondents tending to show the correctness of the flint rock estimates and another mass of evidence by the appellants tending to show that the amount of overcharges for the excavation of flint rock would amount to from twelve hundred dollars to two thousand dollars.

The trial court, at the conclusion of the evidence, made the following finding of facts:

"The court finds that in this case upon the evidence adduced herein there was an over-charge on the final computation of costs or totaling of costs made by the city engineer and filed by said engineer as the basis for

levying the special tax and fixing the amount of the taxbills herein, and that such over-charge amounts to thirty-three and one-third per cent of the flint rock charge which entered into and made a part of the amount of said final computation of costs or totaling of costs, and of the total amount of the taxbills issued in favor of the defendant Huff in this case.

"The court, however, finds that defendant Huff and the city inspector and the city engineer were not guilty of fraud in connection with such over-charge, but that said city engineer and sewer inspector were guilty of gross negligence and carelessness in connection with the making up of said final computation of costs and in keeping account of the amount of flint rock excavation going to make up a part of the total cost of the construction of the sewer, the taxbills for which are involved herein."

Judgment was entered accordingly and plaintiffs have appealed.

I. This is a suit in equity, as we have seen, by the plaintiffs to cancel certain taxbills issued against the plaintiffs and made a lien on their real property for the construction of a sewer in district No. 5 of the city of Springfield, Missouri, a city of the third class. The city entered into a contract with John Huff, as contractor, to construct said sewer, which work, being completed, the city thereupon issued the taxbills in controversy and delivered them to the contractor. Among other grounds for relief set out was that there was fraud and collusion between the contractor and inspector by which the contractor received an allowance for flint rock excavation greatly in excess of the real amount.

The act governing cities of the third class does not in specific terms provide for the appointment of a city engineer. Section 5765, Revised Statutes 1899, however, provides: "The mayor, with the consent and ap-

proval of the majority of the members elected to the city council, shall have power to appoint a street commissioner and such other officers as he may be authorized by ordinance to appoint." Section 5848, Revised Statutes 1899, provides that certain duties shall be performed by *the city engineer or other officer,* and there can be no doubt that the city may under section 5765 appoint a city engineer.

In this case the city had appointed C. E. Phillips, who was, prior to the time of the letting of the contract in question, acting as the city engineer. Under section 5848, Revised Statutes 1899, an officer other than the city engineer may perform the duties in regard to sewers. Under this section, the language used is, "the city engineer or other officer." [See Weesner v. The Central National Bank, 106 Mo. App. 668, 672, 80 S. W. 319.] Section 5848 provides that "as soon as any district sewer shall have been completed, the city engineer or other officer having charge of the work shall compute the whole cost thereof, and shall apportion the same against the lots or pieces of ground, exclusive of improvements, . . . and the council shall thereupon levy and assess a special tax, by ordinance, against each lot or piece of ground within the district, in the name of the owner thereof; . . ."

The evidence in this record shows that the inspector, R. S. Eddy, was appointed by the city engineer; that it was his first job and that he had no experience in this line of work; that he had no skill or experience or training to fit him for the difficult tasks of his position and could not be considered a proper officer to act as engineer. He was employed by the day, receiving his pay directly from Mr. Phillips but indirectly from John Huff, the contractor, for which payments a charge is made in the taxbills. He stated that he had no commission of any kind from the city; that his appointment was not made with the consent or approval of the sewer committee or the city council. There was no

evidence that he was in any way an assistant engineer. He took no oath of office and gave no bond for the faithful discharge of his duties. The evidence further shows that the measurements of the rock were made exclusively by the inspector, that such measurements were not made under the personal supervision of the city engineer, that the city engineer made no personal investigation to see whether the report of the inspector was correct or not, and that he made no test in any way to check up these measurements. That after the measurements of the rock had been made, the inspector made a report to the city clerk, and that the city engineer took the inspector's report or book and incorporated the amount of rock excavated, as shown by such book, in his final report showing the cost of the construction of the sewer, and the taxbills in question were issued upon his estimate.

Section 649 of the ordinances provides as follows:

"Sec. 649. The word 'engineer' as herein used shall mean the party designated as such by the city council who shall have charge of all work done under the provisions of this article to inspect and superintend the same, and subject to the approval of the sewer committee and the city council, may appoint the necessary assistants to enable him to carry on the work he may have in hand."

Section 648 of the ordinances is as follows:

"Sec. 648. All work done under the provisions of this article shall be carried on under the direction of the engineer and sewer committee, and shall be done in accordance with the plans, specifications, rules and regulations on file in the office of the engineer, and in accordance with the contract and ordinances governing same."

The contract for the construction of the sewer provided as follows: "The word engineer as herein employed, shall be construed to mean such person as shall be designated by the city council, whose duty it shall be

to superintend the work in all its details, pass upon, and reject such material as may not be in conformity with these specifications, designate when work shall begin, and superintend construction, pass upon all questions as to the intent and meaning of these specifications. The engineer, subject to the approval of the sewer committee, may appoint, and place upon the work, such inspectors as he may see fit, fully authorized to act for him in his absence."

It will be seen from this provision of the contract and those following it, hereinbefore set forth, that the city at the time of making the same, with knowledge of the expense of rock excavation, and knowing that after the completion of the sewer no accurate measurement could be made, adopted unusual safeguards to secure correct measurement and protect the taxpayers against excessive charges by the contractor by providing that "whenever rock is encountered in excavating the trenches, it shall be stripped of the earth in sections of not less than fifty feet in length, and the engineer duly notified that he may measure and cross-section the same." And by further providing a penalty for failure to comply with this condition: "All rock removed before such measurement is made, or rock more than six inches below the grade of the bottom of the trench, will not be allowed for and estimated." This provision was wholly disregarded. The rock was not prepared for measurement by being stripped of earth in sections of not less than fifty feet in length and the engineer was not notified, and in defiance of the requirement, the rock was measured and allowed for. According to the testimony of the inspector himself, he was never required to read the contract between the city and Huff, and was never informed of its contents. He stated that when he encountered flint rock in the course of the excavation, he did not cause the same to be stripped of earth nor did he give the engineer notice to measure it. Indeed, it seems that the inspector had no definite idea as to

what was the meaning of "a well-defined flint ledge formation" mentioned in the contract.

The provisions of the city ordinances and of the contract as to the inspector can only be interpreted to mean that the inspector was to have oversight of the sewer construction as the agent and servant of the engineer during his temporary absence from the work. Such inspector was not a proper officer as contemplated by section 5848, Revised Statutes 1899; he was in no sense an assistant engineer, nor did he become in any sense an officer. Neither the statute, city ordinances, nor the contract sanctioned the substitution of the inspector for the engineer, nor did they authorize the inspector to perform the duties enjoined upon the engineer personally. The official estimate by the engineer of the amount of flint rock excavated in the sewer under the facts in this case was a prerequisite to the validity of the taxbills. [Rich Hill v. Donnan, 82 Mo. App. l. c. 388.]

The law in this State seems to be well settled that a public officer cannot delegate to others the performance of the duties of his office; and in cases of the character of the one before us, it would seem too plain for argument that the property-owners against whose property the assessment is proposed to be levied, as well as the general public and all other persons interested, have the right to receive the benefit of the skill, judgment and industry of the constituted public officer in the discharge of the prescribed duties of his office. Reasonably interpreted, the law did not require the engineer in this case to perform the mere manual or clerical labor necessary to the actual measurement of the flint rock formation; such work might have been performed legally by assistants in his office, in his presence and under his supervision. But what the public and all parties concerned had a right to expect of him was that he should take the sewer construction under his personal control and that he would apply his professional skill and judg-

ment in securing a proper measurement of the rock in this sewer, as provided by the contract. We hold, under the circumstances disclosed in this record, that the engineer could not delegate the performance of those duties to the so-called inspector; that under the statute, the ordinances of the city and the very contract itself, the measurement of the rock should have been made by the engineer as above stated. [Galbreath v. Newton, 30 Mo. App. 380; The Barber Asphalt Pav. Co. v. O'Brien, 128 Mo. App. 267, 107 S. W. 25; Sedalia to use v. Donohue, 190 Mo. 407, 89 S. W. 386.]

II. The trial court, after a prolonged examination of the mass of evidence in this case, found that the contractor had overcharged by reason of the illegal measurement of the excavation of flint rock in the sewer, thirty-three and one-third per cent. of the total amount charged for flint rock excavation. A careful examination of the evidence fully sustains the finding of the trial court. But the difficulty of ascertaining the exact amount of flint rock actually excavated in the sewer was very great and the re-survey of the sewer for that purpose took place nearly two years after the completion of the sewer and levels were run according to the surface after the filling, settling and washing had taken place for that period of time. As is well stated in respondents' brief, such measurements were necessarily imperfect.

The evidence abundantly shows that the measurements of the flint rock in this sewer and the disregard of the contract provisions as to how the rock should be measured was with the full knowledge of the contractor. That he was a man of much experience and fully cognizant of the illegal measurements, and that if he did not actually instigate them, he at least knew they were being made in his interest and sanctioned and approved them with the expectation of receiving pay in excess of what he was legally entitled to under his contract. It

further appears that there was entirely harmonious action between the contractor and the inspector as to the measurements and classification of the flint rock, and it is quite academical whether the sewer inspector was guilty of gross negligence and carelessness and whether there was actual fraud as to such illegal classification and measurements. In any event, the contractor was co-operating with the inspector in his illegal measurements in order to receive money from the taxpayers not due him, and was, under the evidence, guilty of constructive fraud.

The defendants in this case having shown that charges were made for excavating flint rock in excess of the amount allowed by the contract, the burden would then shift to the contractor to purge the taxbills of all the illegal parts thereof and to give the court data and facts by which it could separate that which was bad from that which was good. In such case, it would be the duty of the court to render the judgment for what was legal and proper and to cull out of the taxbills the parts which represented the illegal charges. [Haag v. Ward, 186 Mo. l. c. 349, 85 S. W. 391.] In this case, the sewer having been completed, it is no longer practicable to make an accurate estimate of the actual amount of rock excavated, and, under the circumstances disclosed in this record, it being impossible to make an actual measurement and separate the legal from the illegal charges, the whole amount included in the taxbills for flint excavation, being the sum of $2044.62, is declared illegal and void.

The judgment is therefore reversed and the cause remanded with directions to the trial court to enter judgment for the respondents against the appellants on the tracts or parcels of land described in the respective taxbills for the amount of said taxbills after deducting the sum of $2044.62, and that said respondent, John Huff, recover the balance, being the sum of $2018.71, and the interest on that sum, as provided by

section 5848, Revised Statutes 1899, from April 10, 1907, the date of the issuance of such taxbills, and that said court apportion the sum of $2018.71 as provided by said section 5848, and that the appellants recover their costs in this action. All concur.